```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SCUTTI ENTERPRISES, LLC,

                        Plaintiff,          01-CV-6533T

        v.                                  DECISION
                                            and ORDER
PARK PLACE ENTERTAINMENT CORPORATION and
PARK PLACE AKWESASNE CONSULTING CORP.,

                        Defendants.
_____
```

                            INTRODUCTION

On November 1, 2001, plaintiff Scutti Enterprises, LLC, ("Scutti") brought this action pursuant to several provisions of New York statutory and common law claiming that the defendants Park Place Entertainment Corp., and Park Place Akwesasne Consulting Corp. (collectively "Park Place") tortiously interfered with Scutti's contractual and prospective business relations, engaged in unfair competition, and engaged in anticompetitive behavior in violation of the Donnelly Act.

By Decision and Order dated March 11, 2002, I found that plaintiff had failed to state a cause of action under any of its alleged theories of liability, and granted defendants' motion to dismiss the Amended Complaint. Plaintiff appealed my March 11, 2002 Decision and Order, and by Decision and Order dated February 28, 2003, the Second Circuit Court of Appeals affirmed in-part and vacated and remanded in-part my previous determination. Specifically, the Court of Appeals affirmed my dismissal of

plaintiff's tortious interference with contractual relations claims, as well as claims of unfair competition and violations of the Donnelly Act.  The Second Circuit, however, vacated and remanded for further proceedings my dismissal of plaintiff's claim for tortious interference with prospective business relations.  The Court of Appeals held that plaintiff had stated a prima facie case of tortious interference with prospective relations, (the "tortious interference" claim) and therefore, that claim only was not subject to dismissal pursuant to Rule 12(b).  Upon remand, the parties engaged in discovery with respect to the sole remaining claim of tortious interference.

By motion dated November 18, 2004, defendants now move for summary judgment with respect to plaintiff's claim for tortious interference.  Specifically, defendants contend that there are no material facts in dispute, and that based on the uncontroverted facts, they are entitled to judgment in their favor.  Plaintiff opposes defendants' motion.  For the reasons set forth below, and after reviewing the facts in the light most favorable to the plaintiff, I find that no reasonable jury could find that the plaintiff could prevail on its claim for tortious interference.  Accordingly, I grant defendants' motion for summary judgment.

BACKGROUND

The factual background of this action was set forth in detail in my March 11, 2002, Decision and Order. The salient facts, with additional facts germane to this motion, are set forth below.

In 1985, members of the Mohawk tribe ("the Mohawks" or "the Tribe") built a 35,000 square foot Class II gaming facility known as the "Bingo Palace" on the St. Regis Mohawk Indian Reservation located in Akwesasne, (formerly known as Hogansburg), New York. A Class II gaming facility may offer games such as bingo, and may offer video slot machines, but may not offer table games such as blackjack. See 25 U.S.C. § 2703(7) (defining term "Class II gaming"). In addition to bingo and other permissible games, there are 127 slot machines located at the Bingo Palace.

During the mid 1990's, Scutti sought investment opportunities in connection with Indian gambling casinos. Fedele Scutti, the principle of Scutti Enterprises, met with the then-current owners of the Bingo Palace to discuss expansion opportunities. In 1995, the Mohawk tribe took control of the Bingo Palace from the original owners, but continued to negotiate with Scutti.

Thereafter, on October 7, 1997, Scutti submitted to the Mohawks a Proposed Management Contract to manage the Bingo Palace and to consult with the Tribe on gaming issues. Under the terms of the contract, Scutti agreed to provide the Mohawks with $3 million of capital advances for renovations to the Bingo Palace. In

return, the Tribe agreed to give Scutti 25% of the profits from the Casino, and to pay back the loan.  The Proposed Management Contract was to run for five years, with a two-year renewal period.

Neither the Proposed Management Contract nor the First Amended Proposed Management Contract were ever approved by the National Indian Gaming Council, and therefore, pursuant to the Contract's provisions, never became legally binding on the Tribe or Scutti.

In April, 1998, pursuant to the terms of the 1997 Proposed Management Agreement, plaintiff submitted a business plan to the Mohawk tribe which proposed a major remodeling of the Bingo Palace budgeted at $4.3 million.  The business plan also proposed converting the Bingo Palace from a Class II gaming facility to a Class III facility, which would allow the facility to also offer table games such as blackjack.

Shortly after the 1997 Proposed Management Agreement was approved by the Mohawks, the Mohawks commenced construction of a new casino, the Akwesasne Mohawk Casino, (the "Akwesasne"), on the St. Regis Mohawk Reservation, not more than 20 miles from the existing Bingo Palace Casino.  See Complaint at ¶ 40.  Plaintiff contends that this casino, which was operated by the management company President R.C. St. Regis LLC, ("President"), was built as result of a "rift" within the Tribe.  Id.

Despite the fact that the Mohawks began building a new casino in close proximity to the Bingo Palace, Scutti and the Mohawks

reaffirmed their relationship in October 1998, when they entered into a First Amended Proposed Management Contract, which essentially recited the terms of the original Proposed Management Agreement.

The Akwesasne Mohawk Casino opened in April 1999, and immediately experienced a number of problems due to poor physical construction of the building, and mismanagement. Plaintiff alleges that in the summer of 1999, President met with Park Place to discuss the possibility of Park Place taking over management of the Akwesasne Mohawk Casino in exchange for President's introducing Park Place to the Mohawks. Plaintiff contends that President wanted Park Place to buy out President's interest in the Akwesasne, and that Park Place wanted an introduction to the Mohawks for purposes of securing future rights to develop Mohawk-owned casinos in the Catskill Mountains area of New York.

In April, 2000 Park Place and the Tribe entered into a development agreement whereby Park Place paid $3 million to the Tribe in return for exclusive rights to develop casinos in New York State in locations other than the Catskills and the Akwesasne area. The agreement specifically excluded Park Place from any involvement with the Bingo Palace or the Akwesasne Casino.

As of January 2001, the National Indian Gaming Commission had yet to approve the Proposed Management Agreement between Scutti and the Mohawks. In an effort to improve the operations of the

Bingo Palace, the Mohawks, by letter dated January 23, 2001, asked Scutti to manage the Bingo Palace as a Class II gaming facility until Class III status was approved.  Although plaintiff alleges in the complaint that it was "well known that in order for the [Bingo Palace] Casino Project to proceed, . . . the Plaintiff required a sufficient number of [new slot machines] to generate enough cash flow to overcome the cash costs of remodeling the Bingo Palace", there is no allegation or evidence that Scutti ever conveyed this opinion to either the Mohawks or the defendants.

Despite having contacted Scutti in January to inquire about expanding the Bingo Palace as a Class II facility under Scutti's management, the Mohawks, on March 22, 2001, entered into a Business Turn-Around and Consulting Agreement (the "Turn-Around Agreement") with Park Place under which Park Place agreed to act as a consultant with respect to the Akwesasne Casino.  Under the Consulting Agreement, Park Place agreed to loan the Mohawks $6 million to renovate the Akwesasne facility, with the possibility of an additional $2 million for additional renovations, and an additional $1 million for legal expenses in connection with a suit brought by President against the Tribe with respect to its former management of the Akwesasne Casino.  The Turn-Around Agreement also provided that the Tribe could not operate any other Class II facility within 20 miles of the Akwesasne Casino, but exempted the Bingo Palace (which was within 20 miles of the Akwesasne casino)

provided that the Mohawks did not increase the number of slot machines at the Bingo Palace. Specifically, with respect to the VLT limitation, the Turn-Around Agreement provided in relevant part that:

> During the term of this Agreement, neither Consultant . . . nor the Tribe shall establish, manage, conduct, consult, or participate in any Class III gaming . . . or participate in the use or operation of electronic gaming devices in any Class II gaming . . . other than under this Agreement, within a twenty (20) mile radius of the {Akwesasne Casino] . . . . Notwithstanding the foregoing, the Tribe may continue to operate Class II electronic gaming devices in the . . . Bingo Palace: provided, however, that the number of devices in operation shall not exceed the number in operation on March 22, 2001.

Turn-Around Agreement at p. 7. The Agreement further provided that the term of the Agreement would commence on the date when the Agreement was approved by both the New York State Racing and Wagering Board and the Tribal Gaming Commission.[1]  Turn-Around Agreement at p. 6. In 2001, the Akwesasne became profitable, and the Tribe declined to take the loan offered by Park Place. On November 15, 2001, shortly after plaintiff filed this lawsuit, Park Place and the Mohawks amended the Turn-Around Agreement and struck

---

[1] It is not clear when, if ever, the Turn-Around Agreement was approved by the New York State Racing and Wagering Board and the Tribal Gaming Commission. Accordingly, it is not clear when, if ever, the VLT restriction, that was conditioned on the approval of the Agreement by those two entities, became binding under the Turn-Around Agreement.

the provisions providing for up to $9 million in loans, and the restriction limiting the number of slot machines at the Bingo Palace.

Scutti alleges that as a result of the 127 slot machine limit that may have been in place sometime after March 22 until November 15, 2001, when it was revoked, it has suffered millions in damages in that the Bingo Palace projects were stymied and effectively terminated, compelling plaintiff to abandon the projects. Scutti alleges that the defendants' acts were calculated to destroy plaintiff's years of effort and substantial investment in the Bingo Palace projects.

## DISCUSSION

### I.  Defendants' Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. R.B. Ventures, Ltd. v. Shane, 112 F.3d 54 (2nd Cir. 1997). If, after considering the evidence in the light most favorable to

the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. Annis v. County of Westchester, 136 F.3d 239, 247 (2nd Cir. 1998).

Plaintiff's sole remaining claim in this action is a claim for tortious interference with prospective business relations. Plaintiff claims that the defendants tortiously interfered with plaintiff's prospective business relations involving the Mohawk Tribe and projects relating to the Bingo Palace. Specifically, plaintiff alleges that:

> Through Park Place Defendants' numerous misrepresentations, repeated and unjustified maligning of Plaintiff and its principals, and other wrongful and illegal acts undertaken in furtherance of Park Place defendants' devious scheme to destroy the benefits of Plaintiff's efforts on the [Bingo Palace] Casino Project, Park Place defendants have wrongfully and tortiously, with the specific intent to damage and injure Plaintiff, interfered with Plaintiff's existing and prospective business relations with the Mohawks, the government agencies, Plaintiff's consultants, as well as other businesses.

Amended Complaint at ¶ 90.

To state a claim for tortious interference with business relations, the plaintiff must show: (1) business relations with a third party; (2) interference with those relations; (3) that the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) injury to the plaintiff. Scutti v. Park Place Entertainment Corp., 322 F.3d 211, 215 (2003).  In Scutti,

the Court of Appeals reaffirmed that under New York law, a defendant's wrongful use of economic pressure against a third party to induce interference with a business relationship between the third party and a plaintiff can establish a claim for wrongful interference with a business relationship. Scutti, 322 F.3d at 216. Specifically, the Court (citing the Restatement (Second) of Torts) held that "economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference [with business relations]." Scutti, 322 F.3d at 216. With respect to this case, the court held that Scutti would be able to establish a claim for tortious interference if it could establish that "Park Place's loan offer . . . was economic pressure unrelated to [the gaming and casino] business, and was wrongfully aimed at extinguishing Scutti's relationship with the Mohawks." Scutti, 322 F.3d at 217.

Having reviewed the evidence in the light most favorable to the plaintiff, I find that no reasonable trier of fact could conclude that Park Place's loan offer and corresponding requirement that the Tribe limit video lottery terminals ("VLT's") at the Bingo Palace was unrelated to the gaming and casino business in which Scutti and Park Place were competitors. The uncontroverted evidence demonstrates that the loan offer was made as part of an agreement designed to turn around the fortunes of an ailing casino,

and for the purpose of securing the development rights to a casino in Sullivan County.

Park Place has proffered two reasons for offering to make a loan of $6 to $9 million to the Tribe for improvements to the Akwesasne Casino.  First, although Park Place believed that income opportunities at the Akwesasne Casino were limited due to its location and size, Park Place was vigorously pursuing the opportunity to develop a casino with the Tribe in the Catskills or Sullivan County, (the proposed "Monticello" casino) and considered investment in the Akwesasne Casino a cost of doing business with the Tribe.   See Deposition Testimony of Tom Brosig at pp. 52-53 (stating that "the real prize for Park Place was the Monticello casino and that we had to get some credibility by stopping the bleeding in Akwesasne."); Deposition Testimony of Clive S. Cummis, Esq. at pp., 42-43 ("we were not interested in Akwesasne unless we had a deal with the Tribe so far as the Catskills were concerned).

The second reason proffered by Park Place for offering to make the loan to the Tribe was that based on its comprehensive review of what it would take to return the Akwesasne Casino to profitability, (a review which began in April, 2000, some 11 months before the loan proposal was made), Park Place determined that approximately $6 million in upgrades and renovations would be required. Specifically, Park Place believed that at least $6 million would be

needed to purchase new gaming machines for the facility, and that other improvements were necessary. See Exhibits 61-64.

I find that the reasons proffered by Park Place for proposing the loan to the Tribe demonstrate that the loan was proposed in connection with Park Place's legitimate business interests relating to the casino and gaming industry. Park Place has demonstrated through uncontroverted evidence that it sought to develop a casino in the catskills or in Sullivan County, and that in an effort to secure those development rights, if offered to consult with and loan money to the Tribe to help turn around the Tribe's Akwesasne Casino. The uncontroverted evidence also demonstrates that Park Place undertook a lengthy and comprehensive review of the operations of the Akwesasne Casino, and determined that $6 to $8 million in improvements would be necessary to revitalize that casino.

Conversely, the plaintiff has failed to produce any evidence that the proposed loans were not made in connection with Park Place's desire to gain favor with the Tribe and develop a casino in Sullivan County; or with Park Place's interest as a consultant in rehabilitating the Akwesasne Casino. Indeed, plaintiff concedes that: "[i]t is readily apparent that Park Place's only true intent [in proposing the $6 million loan] was to preserve its exclusivity with the Mohawks with respect to the development of a potential casino in Sullivan County." Plaintiff's Statement of Material

Facts not in Dispute at pp. 12-13, ¶ 16. Park Place readily concurs with plaintiff's characterization of its reason for proposing the loan to the Tribe, and such a motive establishes that the loan offer was made in connection with Park Place's legitimate business interests.

With respect to the VLT limitation, Park Place has proffered that it insisted that the Bingo Palace be limited to the number of VLT's that were in place at the time the loan offer was made for the purpose of protecting its proposed investment. Under the terms of the Turn-Around Agreement, Park Place's investment in the Akwesasne would be repaid from revenue generated by that casino, or any other Tribe casino developed by Park Place. Because at that time Park Place had not developed any casinos with the Tribe, the only source for repayment of the loan would be from revenues generated by the Akwesasne. Park Place thus wanted assurances from the Tribe that the number of VLT's at the Bingo Palace (less than 20 miles away from the Akwesasne Casino) would not increase, and thus potentially siphon-off revenue from the Akwesasne Casino.

Just as plaintiff has failed to produce any evidence that the loan offer was made for any reason other than a legitimate business purpose, plaintiff has failed to produce any evidence that the VLT restriction was enacted for any reason other than to protect the Akwesasne Casino's revenue stream. Plaintiff's arguments that Park Place didn't have a serious interest in the Akwesasne; thought that

the Casino was not up to standards; lacked economic viability; or that Park Place did not consider Scutti to be a true competitor are inapposite, as plaintiff concedes that the Park Place loan offer was made for the purpose of securing its relationship with the Tribe, and has produced no evidence that the VLT restriction was imposed for any reason other than to protect the Akwesasne's revenue. Accordingly, viewing the evidence in the light most favorable to the plaintiff, I find that no reasonable trier of fact could conclude that Park Place's loan offer and corresponding VLT limitation clause were made for any reason other than for a legitimate business purpose in furtherance of Park Place's gaming and casino businesses.

## CONCLUSION

For the reasons set forth above, I grant defendants' motion for summary judgment, and dismiss plaintiff's Amended Complaint.

ALL OF THE ABOVE IS SO ORDERED.

S/ Michael A. Telesca

MICHAEL A. TELESCA
United States District Judge

Dated:   Rochester, New York
         August 18, 2005